

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00020-CV

_____

IN THE MATTER OF THE MARRIAGE OF
HERMAN TYESKIE AND INGER TYESKIE

On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2015-1636-DR

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Moseley

O P I N I O N

Herman and Inger Tyeskie were married on January 3, 2009. In 2015, Herman petitioned for divorce, prompting a counterpetition for the same filed by Inger. In her counterpetition, Inger filed a claim for reimbursement to her separate estate for assets expended by it for the benefit of the community estate. The trial court entered a final decree of divorce and divided the community estate. On appeal, Inger argues (1) that the trial court erred in failing to credit $52,576.21 to her separate estate for the down payment made on the marital home and (2) that the trial court erred in entering a turnover order without providing notice, which violated her constitutional right of due process.

We find that evidence established that the down payment for the marital home, which was acquired during the marriage, came from a bank account containing comingled funds. Because Inger failed to trace those funds to her separate property by clear and convincing evidence, the trial court properly concluded that the down payment was made by the community estate. We further overrule Inger's second point of error because nothing required the trial court to provide her with notice prior to entry of the post-judgment turnover order and Inger failed to preserve her complaint that she was entitled to such notice. Accordingly, we affirm the trial court's judgment.

I. Factual and Procedural Background

At the final hearing, Herman sought a fifty percent interest in (1) the equity in the marital home and (2) community funds that Inger had deposited into her savings account, withdrawn, and

gifted her adult child from another marriage.[1] With respect to the marital home purchased in 2013, both parties agreed that its value was $245,900.00 and that a $52,576.21 down payment was made to acquire the home. Herman testified that the down payment came from Inger's savings account, which had $162,168.61 before their marriage.

Although Herman acknowledged that the balance in Inger's savings account before marriage was her separate property, he testified that by the time the home was purchased in 2013, Inger had comingled community property funds into the account and that the down payment had come from the community funds. Herman explained that Inger worked for the United States Postal Service, deposited checks earned as a result of her employment into her checking account, and then transferred funds from her checking account into her savings account. The bank records demonstrated that the withdrawal for the down payment was made in November 2013 and that the bank balance before the withdrawal was $282,847.69. Thus, Herman testified that Inger had deposited $90,000.00 to $120,000.00 of community funds by 2013 into her savings account from income earned after the marriage.[2] Herman also stated that he gave Inger cash with which to pay most of the utilities associated with the use of the marital home in addition to one-half of the mortgage payment. He clarified that he was seeking fifty percent of the equity in the home. When questioned, Inger admitted that Herman was entitled to one-half equity in the home.

Next, Herman testified that Inger withdrew $299,681.93 of community funds on June 5, 2015, from her BancorpSouth checking account and that those funds, with interest, totaled

---

[1]Herman testified that he and Inger both owned homes prior to the marriage and stipulated that those homes were separate property.

[2]Records from Inger's Citizen's Bank savings account were admitted into evidence to support Herman's claims.

$137,513.32. Inger acknowledged that the funds in the account were community funds, but disagreed with the contention that Herman was entitled to share in the income she had earned from work during their marriage. With respect to these funds, Herman testified that Inger had given her adult daughter a $300,000.00 cashier's check using those funds. According to Herman, Inger's former attorney requested that she place $300,000.00 in his trust account, but she did not comply. When Herman requested an accounting of the $300,000.00, Inger's counsel responded, "As I previously advised, Mrs. Tyeskie did account for the cashier's check. She gave it to her daughter, period." Herman sought one-half of those community funds.

Inger was served with a subpoena requesting documentation and bank statements related to the $300,000.00. Inger acknowledged receipt of the subpoena, but failed to bring those records to the final hearing. Her testimony further established that Inger lives with her adult daughter, answered the door when a process server attempted to serve a subpoena on her daughter, claimed that her daughter was not at the home, failed to give her daughter the process server's contact information as requested, and instructed her daughter not to attend the final hearing. Inger further admitted that the funds were community property, decided to give them to her daughter anyway, and failed to report the gift to the Internal Revenue Service.[3]

In a letter dated September 19, 2017, the trial court ordered that the marital residence be placed on the market for sale and indicated that it would enter a judgment in Herman's favor. In

---

[3]The record also demonstrated that the parties attempted to resolve conflicts during the pendency of the divorce by entering into a Rule 11 agreement. Herman testified that Inger violated that agreement by, among other things, ransacking his belongings, stealing his truck and failing to return its contents, assaulting him with an iron that caused substantial burns to the arm, taking his guns, threatening to kill him, and causing thousands of dollars worth of damage to his car by beating it with a poker.

its January 2, 2018, final judgment, the trial court awarded, among other things, "[t]he sum of sixty-eight thousand seven hundred fifty-two dollars and sixty-six cents ($68,752.66) representing [Herman]'s fifty percent (50%) of the community interest in the savings account . . . at Citizen's Bank, Longview, Texas[,] that was fraudulently removed by Respondent, Inger Tyeskie." The trial court determined that the marital home was community property, ordered that it be placed for sale, and required the net sales proceeds to be equally distributed to Herman and Inger, provided that Inger had already satisfied the judgment entered in Herman's favor for the $68,752.66. The order gave Inger fifteen days in which to either pay the judgment or deliver a promissory note and security agreement to Herman cementing her obligation.

Inger did not comply with the trial court's orders contained in the divorce decree. As a result, on January 19, 2018, the trial court entered a turnover order and appointed a receiver to take possession of and sell Inger's leviable assets. Inger was ordered to "turnover to the Reciever within five (5) days from [her] receipt of a copy of [the] Order" bank statements, tax returns, credit applications, cashier's checks representing gifts or payments to third parties, all documents and financial records requested by the receiver, and all "all checks, cash, securities . . . promissory notes, documents of title, and contracts" owned by her, which constituted leviable, non-exempt property. The order was delivered to Inger on January 24.

Again, Inger did not comply with the trial court's turnover order. On January 30, the receiver filed a motion for enforcement by contempt. On the same day, Inger was served with an order requiring her appearance in court. After she had fired her previous attorney, Inger appeared in court on February 22, 2018, and requested that the trial court appoint her counsel to assist with

5

the proceedings. The trial court determined that Inger was not indigent and warned her of the consequences of failing to comply with its orders. On February 26, the receiver served on Inger a motion compelling production of the documents referenced in the trial court's turnover order. A subpoena issued to Inger on February 27 for a March 8 hearing was served on Inger on March 2. Although the subpoena informed Inger that her failure to appear would result in the trial court holding her in contempt of court, Inger's return of service contained a handwritten note indicating that she would refuse to appear. On March 7, the trial court signed an order requiring Inger to sign a real estate listing agreement and cooperate with the listing agent or face contempt of court.

Inger appeared at the March 8 hearing and provided testimony demonstrating that she did not comply with the court's orders. The evidence also showed that Inger endorsed a $299,681.93 cashier's check made payable to her that was deposited into her brother-in law's BancorpSouth account. When asked about the transaction, Inger "ple[d] the fifth." Inger had also deeded property to a family member without notifying the receiver.

On March 9, 2018, the trial court held Inger in contempt of court and ordered her commitment to county jail, but suspended the sentence on certain terms and conditions. The trial court sent notice of a hearing on the receiver's filing of the final accounting and motion to disburse funds therefrom. The trial court approved the final accounting on March 22. Inger filed her notice of appeal on March 29, 2018.

6

## II. The Trial Court Properly Concluded that the Down Payment Was Made From Community Funds

In her first point of error on appeal, Inger argues that the trial court erred in failing to credit the down payment for the marital home to her. We conclude that Inger failed to meet her burden to prove that the down payment came from separate property funds.

"Community property consists of the property, other than separate property, acquired by either spouse during marriage." TEX. FAM. CODE ANN. § 3.002 (West 2006). "Property possessed by either spouse during or on dissolution of marriage is presumed to be community property." TEX. FAM. CODE ANN. § 3.003(a) (West 2006). "The degree of proof necessary to establish that property is separate property is clear and convincing evidence." TEX. FAM. CODE ANN. § 3.003(b).

"A party seeking to rebut the community presumption must trace the assets on hand during the marriage back to property that is separate in character." *In re Marriage of Born*, No. 06-08-00066-CV, 2009 WL 1010876, at *2 (Tex. App.—Texarkana Apr. 16, 2009, no pet.) (mem. op.) (citing *Cockerham v. Cockerham*, 527 S.W.2d 162, 167 (Tex. 1975); *Boyd v. Boyd*, 131 S.W.3d 605, 612 (Tex. App.—Fort Worth 2004, no pet.)). "Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property." *Id.* (citing *Boyd*, 131 S.W.3d at 612). "The burden of tracing is a difficult, but not impossible, burden to sustain." *Id.* "We are to resolve any doubt as to the character of property in favor of the community estate." *Id.*

"Income earned during marriage is community property." *Id.* at *3 (citing *Bakken v. Bakken*, 503 S.W.2d 315, 317 (Tex. App.—Dallas 1973, no writ)). Evidence from the final hearing established that Inger deposited over $90,000.00 of community funds into her savings account

between the time the parties were married and the down payment was made. "Because community property income had been commingled with the originally separate principal, [Inger] was obligated to trace, by clear and convincing evidence, each account and its holdings from the date of divorce back to the date of the marriage." *See id.* (citing *Cockerham*, 527 S.W.2d at 167).

"Courts have no difficulty in following separate funds through bank accounts." *Id.* "A showing of community and separate funds existing in the same account does not divest the separate funds of their identity and establish the entire amount as community, if the separate funds may be traced and the trial court is able to determine accurately the interest of each party." *Id.* However, the record reveals that Inger made no attempt to establish that the down payment came from separate funds. A mere assertion that "property was purchased with separate property funds, without any tracing of the funds, is generally insufficient to rebut the community presumption." *Daigle v. Daigle*, No. 09-14-00399-CV, 2015 WL 5042145, at *4 (Tex. App.—Beaumont Aug. 27, 2015, pet. denied) (mem. op.) (citing *McElwee v. McElwee*, 911 S.W.2d 182, 188 (Tex. App.—Houston [1st Dist.] 1995, writ denied)).

"Further, when separate and community funds are commingled in a single account and a portion of those funds are withdrawn, it is presumed that the community funds are the first to be withdrawn." *Marriage of Taylor*, No. 06-14-00061-CV, 2015 WL 428121, at *3 (Tex. App.—Texarkana Feb. 3, 2015, no pet.) (mem. op.) (citing *Zagorski v. Zagorski*, 116 S.W.3d 309, 319–20 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (citing *Smith v. Smith*, 22 S.W.3d 140, 146 (Tex. App.—Houston [14th Dist.] 2000, no pet.)). Thus, since the evidence established that community funds were last deposited into Inger's account, and the amount of the community funds

8

deposited exceeded the amount of the down payment, we conclude that Inger did not defeat the presumption that the funds for the down payment on the marital home came from the community estate.

Because Inger did not make any showing requiring the trial court to credit her separate estate for the amount of down payment made on the marital home, we overrule Inger's first point of error.

## III. We Overrule Inger's Complaint that Notice Was Required Prior to Entry of the Turnover Order

"In a decree of divorce . . . , the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party . . . ." TEX. FAM. CODE ANN. § 7.001 (West 2006). "The court that rendered the decree of divorce . . . retains the power to enforce the property division as provided by Chapter 7." TEX. FAM. CODE ANN. § 9.002 (West Supp. 2017). In relevant part, Section 31.002 of the Texas Civil Practice and Remedies Code states,

> (a) A judgment creditor is entitled to aid from a court of appropriate jurisdiction through injunction or other means in order to reach property to obtain satisfaction on the judgment if the judgment debtor owns property, including present or future rights to property, that is not exempt from attachment, execution, or seizure for the satisfaction of liabilities.
>
> (b) The court may:
>
> (1) order the judgment debtor to turn over nonexempt property that is in the debtor's possession or is subject to the debtor's control, together with all documents or records related to the property, to a designated sheriff or constable for execution;
>
> (2) otherwise apply the property to the satisfaction of the judgment; or

9

(3) appoint a receiver with the authority to take possession of the nonexempt property, sell it, and pay the proceeds to the judgment creditor to the extent required to satisfy the judgment.

(c) The court may enforce the order by contempt proceedings or by other appropriate means in the event of refusal or disobedience.

TEX. CIV. PRAC. & REM. CODE ANN. § 31.002 (West Supp. 2017). Inger argues that the trial court was required to provide notice before entering a turnover order. However, "[t]he turnover statute itself does not require notice and a hearing prior to issuance of a turnover order." *Williams Farms Produce Sales, Inc. v. R & G Produce Co.*, 443 S.W.3d 250, 256 (Tex. App.—Corpus Christi 2014, no pet.) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 31.002; *see Ex parte Johnson*, 654 S.W.2d 415, 418 (Tex. 1983) (stating that notice and hearing prior to issuance of the turnover order was not required under predecessor statute); *Sivley v. Sivley*, 972 S.W.2d 850, 860 (Tex. App.—Tyler 1998, no pet.) ("The statute itself does not provide for notice or a hearing to be afforded a judgment debtor in a turnover proceeding.")); *see also Thomas v. Thomas*, 917 S.W.2d 425, 433–34 (Tex. App.—Waco 1996, no writ); *Plaza Court, Ltd. v. West*, 879 S.W.2d 271, 276 (Tex. App.—Houston [14th Dist.] 1994, no writ) (holding that Section 31.002 does not provide for notice to a defendant in turnover proceedings); *Ross v. 3D Tower Ltd.*, 824 S.W.2d 270, 272 (Tex. App.—Houston [14th Dist.] 1992, writ denied).[4]

---

[4]The only conditions that must be met prior to the entry of a turnover order are, as follows:

(1) the entity that is to receive aid must be a judgment creditor;
(2) the court that would grant aid must be one of appropriate jurisdiction;
(3) the aid to be given must be in order to reach property to obtain satisfaction on the judgment; and
(4) the judgment debtor must own property (including present or future rights to property) that:
(a) cannot be readily attached or levied on by ordinary legal process and

Inger also argues, for the first time on appeal, that the trial court's entry of a turnover order without prior notice to her violated her constitutional right to due process.[5] In order to preserve a complaint for appellate review, the record must reflect that the "complaint was made to the trial court by a timely request, objection, or motion" and that the trial court either "ruled on the request, objection, or motion, either expressly or implicitly," or "refused to rule . . . and the complaining party objected to the refusal." TEX. R. APP. P. 33.1(a); *see In re Z.L.T.*, 124 S.W.3d 163, 165 (Tex. 2003). As an appellate court, we review a trial court's ruling or an objection to its refusal to rule. *See* TEX. R. APP. P. 33.1(a)(2). "Important prudential considerations underscore our rules on preservation. Requiring parties to raise complaints at trial conserves judicial resources by giving trial courts an opportunity to correct an error before an appeal proceeds." *In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003).

Even constitutional claims are waived by failure to raise the complaint at trial. *Tex. Dep't of Protective & Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001) (citing *Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex. 1993)). Additionally, to preserve error, "[c]omplaints and arguments on appeal must correspond with the complaint made at the trial court level." *Ferrara v. Moore*, 318 S.W.3d 487, 496 (Tex. App.—Texarkana 2010, pet. denied). "If an issue has not

---

(b)     is not exempt from attachment, execution, or seizure for the satisfaction of liabilities.

*Williams Farms*, 443 S.W.3d at 256. Inger does not contest that these conditions were met.

[5]In *Thomas*, 917 S.W.2d at 433–34, our sister court held that "failure to provide prior notice and hearing before the issuance of a turnover order under Section 31.002 does not compromise constitutional principles."

been preserved for appeal, we should not address it on the merits." *Knoderer v. State Farm Lloyds*, 515 S.W.3d 21, 44 (Tex. App.—Texarkana 2017, pets. denied).

Although she had the opportunity, Inger failed to assert in the trial court that the entry of the turnover order without notice deprived her of due process. Accordingly, we overrule Inger's last point of error.

## IV.    Conclusion

We affirm the trial court's judgment.

Bailey C. Moseley
Justice

Date Submitted:    July 26, 2018
Date Decided:    August 2, 2018

12