# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-20-00382-CV

---

**Dennis Alan Eichhorn, Appellant**

**v.**

**Sarah Eichhorn, Appellee**

---

### FROM THE 250TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-19-002120, THE HONORABLE KARIN CRUMP, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Dennis Alan Eichhorn[1] appeals the trial court's divorce decree, entered after a bench trial. In nine issues, he contends that the court abused its discretion by admitting or excluding certain evidence, mischaracterizing property, miscalculating a reimbursement, finding that a certain amount of personal property was proven, finding that an amount in debt was not proven, and awarding attorneys' fees and conditional appellate fees. Because we hold that Sarah Eichhorn[2] did not carry her burden to show a separate property interest in a house in Austin, Texas (the Texas House), and the trial court abused its discretion by calculating a reimbursement in the community estate's favor based on the value of a house in Irvine, California (the California House), we reverse in part and remand.

---

[1] We refer to Appellant as "Dennis" and to Appellee as "Sarah" for ease of reference.

[2] The trial court's decree changed Appellee's name to "Sarah Elizabeth Frey," but the decree and this appeal are styled using her name from during the marriage.

## BACKGROUND

Sarah and Dennis met in the early 2000s while they were working in academia, and both have earned Ph.D.s in mathematics. They dated and lived together for several years and then moved to Irvine, California, for Sarah's job at the University of California, Irvine (UC Irvine). They married in September 2008. Throughout their time together, Dennis made his living by playing cards, usually poker, and so thought of his card-playing as "investing." Sarah continued to work in academia. Three months before they married, they bought the California House, with each paying about half of the down payment and together borrowing the rest of the purchase price.

Sarah was often the primary earner in the household. Dennis's card-playing income over time, by his own admission, has "been very up and down," including "very rocky" during the two years before the divorce with "some rocky stints in the middle," causing his total profit for "all of the marriage" to be "not very good." He would keep cash or poker chips at the house to be ready for the next "investment opportunity" whenever it arose. He also kept assets in casino boxes and casino players' banks.

Sarah later left her UC Irvine job, and in August 2017 the couple moved to Austin for her new job at the University of Texas at Austin. They lived in temporary housing, and she bought the Texas House, paying cash, to try to get Dennis to stay in Texas even though he had less access to poker rooms in Texas.

The marriage grew insupportable, and Dennis moved back into the California House. Though she stayed in Austin, Sarah paid the mortgage payments on the California House, save for a few months when Dennis paid them.

Sarah filed this divorce suit in April 2019, and the parties tried the suit to the bench on March 2–3, 2020. Sarah, her tracing expert, and Dennis all testified, and the court admitted

2

exhibits offered by each party and excluded others. At the end of the second day of trial, the court rendered divorce and said that it would let the parties file more evidence later on attorneys' fees and summations of all the evidence. There was another hearing the next month (during the early days of the disaster caused by the COVID-19 pandemic), during which the court took more evidence before announcing that the evidence was closed.

In its divorce decree, the court confirmed separate property in Sarah's favor, including 70.88% of the Texas House; rejected separate-property claims of Dennis's, in part because it found that he was not credible about those claims; divided the community estate; and awarded the community estate a reimbursement calculated based on the market value of the California House. The court also awarded Sarah a judgment for $25,000 in attorneys' fees and several amounts in conditional appellate fees corresponding to different levels of the appellate process. At Dennis's request, the court entered findings of fact and conclusions of law. *See* Tex. Fam. Code § 6.711; Tex. R. Civ. P. 296, 297. He now appeals the decree.

## STANDARD OF REVIEW

A trial court's findings of fact after a bench trial have the same force and effect as a jury verdict. *See Catalina v. Blasdel*, 881 S.W.2d 295, 296–97 (Tex. 1994); *12636 Rsch. Ltd. v. Indian Bros.*, No. 03-19-00078-CV, 2021 WL 417027, at *5 (Tex. App.—Austin Feb. 5, 2021, no pet.) (mem. op.); *Wilson v. Wilson*, No. 03-03-00196-CV, 2004 WL 524465, at *1–2 (Tex. App.—Austin Mar. 18, 2004, no pet.) (mem. op.). When there is a reporter's record of the bench trial, the findings can be reviewed for legal and factual sufficiency of the evidence. *See Catalina*, 881 S.W.2d at 296–97; *12636 Rsch.*, 2021 WL 417027, at *5. We may not interfere with the factfinder's resolution of conflicts in the evidence or pass on the weight or credibility of the witnesses' testimony. *12636 Rsch.*, 2021 WL 417027, at *5; *Wilson*, 2004 WL 524465, at *1.

When a party challenges the characterization of property or division of property in a divorce decree, we review those challenges for an abuse of discretion. *See Goyal v. Hora*, No. 03-19-00868-CV, 2021 WL 2149628, at *1 (Tex. App.—Austin May 27, 2021, no pet.) (mem. op.) (citing *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981)); *Ussery v. Ussery*, No. 03-10-00183-CV, 2010 WL 4910049, at *2 (Tex. App.—Austin Dec. 2, 2010, no pet.) (mem. op.). As relevant here, abuse-of-discretion review and traditional evidence-sufficiency review overlap, which means that legal and factual insufficiency are not independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion. *Goyal*, 2021 WL 2149628, at *2. Thus, when deciding whether the trial court abused its discretion, we consider whether it had sufficient evidence on which to exercise its discretion and if so, whether it erred in applying that discretion. *Id.*

"Property possessed by either spouse during or on dissolution of marriage is presumed to be community property," and "[t]he degree of proof necessary to establish that property is separate property is clear and convincing evidence." Tex. Fam. Code § 3.003(a)–(b). "When, as here, the burden of proof at trial is by clear and convincing evidence, we apply higher standards of review for legal and factual sufficiency." *Goyal*, 2021 WL 2149628, at *5 (citing *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002)). "When reviewing the legal sufficiency of the evidence under this higher standard, we consider the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true." *Id.* (citing *J.F.C.*, 96 S.W.3d at 265–66). We must assume that the factfinder resolved disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* (citing *J.F.C.*, 96 S.W.3d at 266). When reviewing the factual sufficiency of the evidence in the same context, we consider all the evidence for and against the finding and decide whether it

4

all would have allowed the factfinder to reasonably form a firm belief or conviction that the finding was proven. *Id.* (citing *J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002)). We decide whether disputed evidence is such that a reasonable factfinder could not have resolved the dispute in favor of the finding under attack. *Id.* (citing *J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 25).

## DISCUSSION

**I. Sarah did not carry her burden to show by clear and convincing evidence a separate-property interest in the Texas House.**

Dennis's first and third issues concern the confirmation of a 70.88% separate-property interest in the Texas House. In his first issue, he contends that the trial court should have excluded Sarah's exhibit 23—bank-account monthly statements, which she offered as tracing evidence to support her claim of a separate-property interest in the house. In his third issue, he contends that, with or without the exhibit, there was insufficient evidence to confirm any separate-property interest in the house.

For the reasons that follow, we hold that there was insufficient evidence for the trial court to exercise its discretion to confirm in Sarah's favor any separate-property interest in the Texas House. To explain this holding, we discuss below the law applicable to "tracing" separate property, Sarah's arguments and evidence from trial to support awarding her a 70.88% separate-property interest in the Texas House, Dennis's arguments on appeal about that evidence, and why the evidence fell short of what was required.

### A. *Tracing separate property*

To rebut the Family Code's separate-property presumption, a party must prove by clear and convincing evidence that property is instead a spouse's separate property. *See* Tex. Fam.

Code § 3.003; *Pearson v. Fillingim*, 332 S.W.3d 361, 363 (Tex. 2011) (per curiam). "Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to truth of the allegations sought to be established. *Goyal*, 2021 WL 2149628, at \*5; *see Wilson*, 2004 WL 524465, at \*2. "By adopting the clear and convincing standard as the requisite degree of proof required to rebut the community presumption, the legislature deliberately imposed a more stringent burden of proof to establish separate ownership of property upon the dissolution of marriage." *Boyd v. Boyd*, 131 S.W.3d 605, 617 (Tex. App.—Fort Worth 2004, no pet.).

Showing separate-property character requires that the party "trace and clearly identify the property in question as separate by clear and convincing evidence." *Pearson*, 332 S.W.3d at 363 (citing *McKinley v. McKinley*, 496 S.W.2d 540, 543 (Tex. 1973)). "Tracing" here requires first that the party show that the property was acquired in exchange for separate property with evidence showing the time and means by which the spouse originally obtained possession of the property. *See Goyal*, 2021 WL 2149628, at \*8; *Ganesan v. Vallabhaneni*, 96 S.W.3d 345, 354 (Tex. App.—Austin 2002, pet. denied).

But the tracing burden also requires evidence over time about the purported separate-property funds used to make a purchase—from the inception of those funds to the date of the relevant later purchase. Even when there is testimony that property possessed at the time the marriage is dissolved was separate property, the clear-and-convincing-evidence standard requires documentary evidence tracing the separate nature of the property. *Lecuona v. Lecuona*, No. 03-17-00138-CV, 2018 WL 2994587, at \*2 n.15 (Tex. App.—Austin June 15, 2018, pet. denied) (mem. op.) (quoting *Barras v. Barras*, 396 S.W.3d 154, 164 (Tex. App.—Houston [14th Dist.] 2013, pet. denied)). Thus, testimony that property was purchased with

6

separate-property funds, without any tracing of the funds from their inception to the relevant purchase, is on its own insufficient to rebut the community-property presumption. *See McKinley v. McKinley*, 496 S.W.2d 540, 543–44 (Tex. 1973); *Goyal*, 2021 WL 2149628, at *6; *Bahr v. Kohr*, 980 S.W.2d 723, 728–30 (Tex. App.—San Antonio 1998, no pet.); *McElwee v. McElwee*, 911 S.W.2d 182, 188 (Tex. App.—Houston [1st Dist.] 1995, writ denied).

When separate and community property have been commingled so that they cannot be resegregated and identified, the community-property presumption prevails. *Goyal*, 2021 WL 2149628, at *6 (citing *McKinley*, 496 S.W.2d at 543); *see also id.* ("concluding that husband had failed to overcome community-property presumption as to certain retirement and brokerage accounts because neither his testimony nor his exhibits provided 'statements of accounts, dates of transfers, amounts transferred in or out, sources of funds, or any semblance of asset tracing'" (citing and quoting *Ganesan*, 96 S.W.3d at 354)). "Gaps in account statements can make tracing evidence less than 'clear and convincing.'" *Id.* at *9 (citing *In re Marriage of Everse*, 440 S.W.3d 749, 752 (Tex. App.—Amarillo 2013, no pet.)). We resolve any doubt about the characterization of property in favor of community status. *Id.* at *6 (citing *Willett v. Rodriguez*, No. 03-16-00084-CV, 2017 WL 2417831, at *2 (Tex. App.—Austin June 2, 2017, pet. denied) (mem. op.); *Sink v. Sink*, 364 S.W.3d 340, 345 (Tex. App.—Dallas 2012, no pet.)).

## B.     *Sarah's arguments and evidence from trial*

Sarah argued at trial that she is entitled to a 70.88% separate-property interest in the Texas House because that was the percentage of the total purchase price of the house that was made up of her separate-property funds. She argued that the separate-property funds came from Capital One bank accounts that she held before the marriage when the accounts were with Capital One's predecessor-in-interest, ING, and in which she maintained separate-property funds.

7

First, she testified that she held funds in ING bank accounts before the marriage. The trial court admitted exhibits showing that in March 2008, Sarah held $87,652.35 in ING accounts. In May 2008 and still pre-marriage, she deposited $10,000 into the same ING accounts, according to her expert's testimony and exhibits. She and Dennis then married in September 2008.

Next, in October 2008 she deposited $15,000 into the ING accounts. The expert opined that of this amount, $14,509.52 was Sarah's separate property. In July 2010, she deposited into the accounts $36,000, of which, the expert opined, $35,485.93 was her separate property. Dennis does not contest the initial separate-property character of these amounts when they were deposited into the ING accounts.

But in March 2011, Sarah made a deposit into the ING accounts whose initial separate-property character Dennis does contest. She deposited $71,000, of which $65,000 was her separate property, she argued. She testified that the $65,000 had been paid to her as part of a start-up package for going to work for UC Irvine before the marriage in 2008. Her expert explained that all this is indeed what she had told him about the $65,000.

In 2012, Capital One acquired ING's U.S. business, so Sarah's ING accounts became Capital One accounts. She bought the Texas House in November 2018. The expert explained in his report that Sarah told him that she never made any withdrawals from the accounts when they were ING accounts, but he admitted that he saw no bank statements to support that representation. He also testified that he saw in her Capital One bank statements—which are what make up her exhibit 23—no evidence of any withdrawals until she bought the Texas House. (Her exhibit 23 is the subject of Dennis's first appellate issue.) About this exhibit 23 and any withdrawals from or deposits into the Capital One accounts from the date of the first statement in the exhibit, Sarah testified in this exchange:

8

Q. . . . [D]id you talk with Mr. Eichhorn or did you tell him about the Capital One accounts?

A. . . . I said on multiple occasions during several different mediation sessions that I had records showing—from my Capital One accounts, the records showed that no money was taken out of the accounts except to purchase the home.

. . . .

Q. Okay. With regards to—and with regards to this Capital One account, as I understand it, basically what the documents show is that you had the original—the original balance that was—these documents indicate is the $255,000 plus; is that right?

A. Yes.

Q. And since—after the time of this first statement, did you add any additional money or make any additional deposits into that account?

A. No.

The court admitted Sarah's exhibit 23 over Dennis's objections, and it contains most of the monthly statements for her Capital One accounts beginning with a January 2013 statement and ending with a December 2018 statement.

When she bought the Texas House in November 2018, the separate-property funds from the Capital One accounts that she applied toward the purchase, according to her expert's work and opinions, totaled $212,647.80. The expert computed this number by adding the $87,652.35 March 2008 ING balance; the uncontested $10,000.00, $14,509.52, and $35,485.93 separate-property deposits; and the contested $65,000 deposit. Because Sarah used $212,647.80 in separate-property funds to buy the house for $300,000, the expert opined that Sarah's separate-property interest in the house was the ratio of $212,647.80 to $300,000.00—70.88%. The trial court awarded Sarah a 70.88% separate-property interest in the house.

9

## C.      *Dennis's arguments on appeal*

Dennis's arguments on appeal attack the sufficiency of the evidence to support the separate-property award in two interconnected ways.  In the more specific of the two, he argues that the evidence was insufficient to support characterizing the $65,000 as Sarah's separate property.  In the more general, he argues that the evidence was insufficient to support the total amount of separate-property funds (of which the $65,000 was a part) that Sarah contends she used to buy the Texas House because of gaps in Sarah's tracing evidence.  Dennis thus challenges the parts of the decree, and the relevant findings of fact and conclusions of law that support them, relevant to the 70.88% separate-property confirmation.

## D.      *The evidence was insufficient to support characterizing the $65,000 as separate property.*

We consider first Dennis's arguments about the $65,000.  According to Sarah's expert's report and to a 2011 Chase Bank statement for the Chase account into which the money was first deposited before being transferred to the ING accounts at issue, the $65,000 was awarded to her "from her 2007 [UC Irvine] hiring but not paid until March 9, 2011," and not transferred to the ING accounts until March 14, 2011.  But when she testified after Dennis's counsel challenged her about whether any UC Irvine paystubs from 2011 showed the $65,000, she said that she did not know the source of the $65,000, thought it had some relation to money to buy a house, but did not have documentary evidence to show the funds' source:

> [Sarah]:  I didn't have documentation on this.  It was too far back.  I got a signing bonus when I—or not a signing bonus, but a gold start-up funds.  Unlike the university, this is a common practice when hiring a professor, to give them start-up funds.  [UC] Irvine allowed them to be used for [a] down payment on a house.  I didn't withdraw the funds at that time because when I made the down payment, after three years, the university closes out your start-up funds.  You only have some amount to spend it.

10

When I closed out my start-up funds, I took the rest as a one-time cash payment or check payment from them. I don't remember the details on when that occurred.

In looking at the checking account, there had been a large deposit right around that time. I had assumed it was that. I don't have any documentation on that, and I told [her tracing expert] that my recollection was that I had gotten these start-up funds as part of my package, and so I don't know about that particular 65K. I don't have any receipts, and I don't have the documentation from the university. I reached out and asked if they had any receipts or anything like this. This would have been outside of payroll. It wouldn't have been a payroll check on pay stubs. It would have been a separate disbursement, and I remember receiving a check as opposed to a direct deposit because it was outside of my normal—

Q. But again—

A. It was too long ago to have documents.

[Dennis's counsel]: Object at this point to nonresponsive.

The Court: Sustained.

Q. Ms[.] Eichhorn, you said you don't have any proof of that. You made an assumption, correct?

A. I—yeah, I mean, I made an assumption on which—when that money was received.

Q. Isn't it true that that $65,000 that was transferred to that savings account in March, 2011 was actually from income that Dennis had earned from his self-employment card playing?

A. I—no, I don't know.

Q. You don't know?

A. I don't know.

(All-capitalization removed and formatting altered.) Additionally, one exhibit shows a $60,000 withdrawal from one of Dennis's casino accounts in late February 2011, and another—a May 2008 payroll statement from UC Irvine—shows a $15,000 disbursement to Sarah that month for a "FAC HSG ALLW". Aside from these exhibits, we do not consider Dennis's testimony about the source of the $65,000 because the trial court ruled that his testimony on the topic was not credible, and

11

we will not undermine that credibility determination. *See 12636 Rsch.*, 2021 WL 417027, at *5; *Wilson*, 2004 WL 524465, at *1. We instead focus on Sarah's testimony, the expert's testimony, and the documentary evidence.

Sarah did not carry her clear-and-convincing-evidence burden to trace the $65,000 as separate-property funds. Documentary evidence of tracing is often necessary to carry the tracing burden of supplying clear and convincing evidence, and she provided none to show that the $65,000 was paid to her before the marriage. *See Lecuona*, 2018 WL 2994587, at *2 n.15. Testimony alone often is not enough, *see Goyal*, 2021 WL 2149628, at *6; *McElwee*, 911 S.W.2d at 188, and even Sarah's testimony both concluded with the observation that she was unsure of where the $65,000 came from and otherwise noted the lack of any documentary evidence to support where it came from. Her expert's testimony and report on this issue relied solely on Sarah's representations and so are no more probative on the issue than Sarah's testimony itself is. On the other hand, the only documentary evidence on the issue from 2008, near when she began her UC Irvine employment in 2007—the UC Irvine payroll statement—shows $15,000 for a "FAC HSG ALLW" being paid to her that year. And the only possible documentary evidence about where the March 2011 deposit into the Chase account came from is the February 2011 withdrawal from one of Dennis's casino accounts. No documentary evidence shows that the $65,000 deposit in March 2011 came from UC Irvine. Because we are to "resolve any doubt as to the character of property in favor of community status," *see Goyal*, 2021 WL 2149628, at *6, there is insufficient evidence to support a firm belief or conviction in the separate-property character of the $65,000 from its inception. *See id.* at *5; *Wilson*, 2004 WL 524465, at *2.

12

### E.  *Overall, the evidence was insufficient to support confirming a separate-property interest in the Texas House.*

More broadly, Dennis challenges the entire 70.88% separate-property interest awarded to Sarah.  Aside from that figure's being based in part on the $65,000 that we have just addressed, large gaps in Sarah's documentary evidence make the evidence overall on the 70.88% figure less than clear and convincing.  *See Goyal*, 2021 WL 2149628, at *9.  Sarah's exhibit 23 purports to trace separate-property funds in the Capital One accounts through November 2018, when she bought the Texas House, and beginning in January 2013.  But for the years between the March 2008 ING statement that is in evidence and the first Capital One statement in January 2013, there is no documentary evidence to show the monthly activity in the accounts.  Thus, even though Sarah explained at trial that separate-property funds were deposited into the accounts in October 2008, July 2010, and March 2011, no documentary evidence tracks those funds from their inception on those dates until January 2013 at the earliest.

The only evidence offered to fill that gap came from the expert.  He wrote in his report that Sarah told him that she had made no withdrawals when the accounts were still with ING, but this does not amount to documentary evidence because it is only a recasting of Sarah's testimony on the topic.  The expert also admitted that "there was definitely a hole in there in statements" for the accounts.  He explained that he tried to fill in the gaps by "look[ing] at the tax returns and" discovering in them that "the tax return interest had not changed so; therefore, the balance" of funds in the account must have stayed consistent.  But circumstantial evidence that an account's month-to-month balance has not changed is not necessarily evidence that no funds were withdrawn from or deposited into the account: withdrawals and deposits of equal amounts within the same month also would make the balance stay consistent.  Plus, when the court asked the expert whether he "rel[ied] on the tax returns to—in forming any of the opinions set forth in [his] report,"

13

he responded: "No.  We had it at the separate property."  The state of the evidence thus was that no document shows the relevant accounts' activity for 57 months (April 2008 through December 2012), and Sarah and Dennis were married during roughly 52 of those months (from September 15, 2008, onward).

In the January 2013 Capital One statement, there was $255,551.32 in the accounts.  But Sarah's other evidence accounts for only $219,652.35 of that amount, which is the sum of the deposits detailed above, of which $212,647.80 was purportedly the separate-property portion.  There was therefore nearly $36,000 more in the accounts than what the evidence otherwise accounted for, which, by operation of the community-property presumption, makes that $36,000 community property.  At best according to Sarah's evidence then, the Capital One accounts commingled separate and community property.  And when "the evidence shows that separate and community property have been so commingled as to defy resegregation and identification, the community-property presumption prevails."  *Id.* at *6 (citing *McKinley*, 496 S.W.2d at 543).  The necessary resegregation and identification is not possible here because of the gap in the documentary evidence from March 2008 to January 2013.  *See In re Marriage of Tyeskie*, 558 S.W.3d 719, 723–24 (Tex. App.—Texarkana 2018, pet. denied) ("'The burden of tracing is a difficult, but not impossible, burden to sustain.'  'We are to resolve any doubt as to the character of property in favor of the community estate.'  . . . 'Because community property income had been commingled with the originally separate principal, [spouse] was obligated to trace, by clear and convincing evidence, each account and its holdings from the date of divorce back to the date of the marriage.'" (internal citations omitted) (quoting *In re Marriage of Born*, No. 06-08-00066-CV, 2009 WL 1010876, at *2–3 (Tex. App.—Texarkana Apr. 16, 2009, no pet.) (mem. op.)); *accord Boyd*, 131 S.W.3d at 613–17.  This Court and others have held that similar gaps in the documentary

14

evidence meant that the evidence did not sufficiently trace purported separate-property character. *See Goyal*, 2021 WL 2149628, at *9 (citing *Marriage of Everse*, 440 S.W.3d at 752); *Boyd*, 131 S.W.3d at 613–17; *Bahr*, 980 S.W.2d at 728–30.

In all, both the issue with the $65,000 and the issue with the large statements gap together mean that there was insufficient evidence for the trial court to exercise its discretion to confirm in Sarah's favor a separate-property interest in the Texas House. *See Goyal*, 2021 WL 2149628, at *2, 4 (review for abuse of discretion involves deciding whether trial court had sufficient information on which to exercise its discretion); *Legere v. Legere*, No. 03-12-00046-CV, 2013 WL 692450, at *3 (Tex. App.—Austin Feb. 22, 2013, no pet.) (mem. op.) (same (citing *Boyd*, 131 S.W.3d at 611)). This is not a situation in which there were only minor gaps in the tracing evidence. *See, e.g.*, *Boyd*, 131 S.W.3d at 614 (discussing *Newland v. Newland*, 529 S.W.2d 105, 107–09 (Tex. App.—Fort Worth 1975, writ dism'd)). We sustain Dennis's third issue to the extent it challenged the confirmation of a separate-property interest and need not reach his first issue about the admission of Sarah's exhibit 23.[3] *See* Tex. R. App. P. 47.1.

## II. Excluding two exhibits about Dennis's separate-property claims was not reversible error because the exhibits depend on his credibility, which the court found lacking.

In his second issue, Dennis contends that the trial court should not have excluded two exhibits, which he prepared to show his separate-property interest in a savings account and in an IRA.[4] He argues that excluding these two exhibits probably caused the rendition of an improper

---

[3] His argument there is that admitting the exhibit was an abuse of discretion that probably caused the rendition of an improper judgment because it led to the separate-property ruling that we have now otherwise reversed.

[4] The bank statements and IRA statements on which Dennis based his work in the two exhibits at issue were themselves otherwise admitted into evidence.

judgment. *See* Tex. R. App. P. 44.1(a)(1); *Triesch v. Triesch*, No. 03-15-00102-CV, 2016 WL 1039035, at \*6 (Tex. App.—Austin Mar. 8, 2016, no pet.) (mem. op.); *Ganesan*, 96 S.W.3d at 351.

But as Sarah notes, the trial court made this finding: "The court did not find Respondent's claims about his separate property or his efforts to seek employment during the pendency of the suit to be credible." We cannot undermine this credibility determination. *See 12636 Rsch.*, 2021 WL 417027, at \*5; *Wilson*, 2004 WL 524465, at \*1. Even if the trial court had admitted the two exhibits about which Dennis complains—exhibits that he created—he has not shown how admitting them would have changed the trial court's view of his credibility. The parts of the decree in which the court ruled that the savings account and IRA were not Dennis's separate property did not turn on excluding the exhibits. They turned on the court's disbelieving Dennis. *See Ganesan*, 96 S.W.3d at 351–52 ("A successful challenge to evidentiary rulings usually requires the complaining party to show the judgment turns on the particular evidence excluded or admitted. We determine whether the case turns on the evidence excluded by reviewing the entire record." (internal citation omitted) (citing *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex. 1995))). We therefore overrule his second issue.

III.     **The trial court abused its discretion by calculating a reimbursement based on the California House's value rather than on the reduction in the principal amount of debt on the house.**

Dennis's fourth issue challenges the sufficiency of the evidence to support the trial court's calculation of a reimbursement in the community estate's favor relating to the California House. It is undisputed that Sarah and Dennis bought the California House together before they were married, making the house separate property. Against their separate-property estates the court awarded the community estate a reimbursement of $364,800, which the court calculated as a certain fraction "of the value of the residence." Dennis argues that there was insufficient evidence

16

to support this amount because calculating it based on the value of the house is not the statutory measure for the kind of reimbursement awarded here.  Instead, he argues, the award should have reflected the reduction over the course of the marriage in the balance of the principal amount of the debt secured by the mortgage on the house.  Using this measure, he says that the only evidence showing the amount by which the couple reduced the balance of the principal debt during the marriage proved that the reduction was no more than $200,000.

Although a trial court has wide latitude in evaluating reimbursement claims, *see Mason v. Mason*, No. 03-17-00546-CV, 2019 WL 1967166, at *1 (Tex. App.—Austin May 3, 2019, no pet.) (mem. op.) (citing *Penick v. Penick*, 783 S.W.2d 194, 198 (Tex. 1988)), the court has no discretion to misapply the law, *see Delancey v. Delancey*, No. 03-10-00240-CV, 2011 WL 677401, at *6 (Tex. App.—Austin Feb. 24, 2011, no pet.) (mem. op.) (citing *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding)).  Family Code section 3.402 governs reimbursement claims.  *See Mason*, 2019 WL 1967166, at *5.  Under that statute, the community estate or a spouse's separate estate may be reimbursed, among other reasons, (a) for having reduced the principal amount of a *debt* secured by a lien on property owned before marriage, to the extent the debt existed at the time of marriage, *see* Tex. Fam. Code § 3.402(a)(3), or (b) for having made certain *improvements* to property, to the community estate, or to a separate estate, *see id.* § 3.402(a)(5), (6), (8), (d).

When reimbursement for improvements is at issue, the improvements are to the community estate or to a spouse's separate estate, and they come from funds expended by a different estate of the spouses, a specific statutory measurement for the reimbursement applies.  Such a reimbursement "shall be measured by the enhancement in value to the benefited marital estate."  *Id.* § 3.402(d).

17

Yet that statutory measure "does not apply to all claims for reimbursement . . . but rather only to claims 'for funds expended . . . for improvements to another marital estate.'" *Mason*, 2019 WL 1967166, at *7 (quoting *Barras*, 396 S.W.3d at 175). "Improvements" here means "capital improvements, such as home construction and renovation," and so does not encompass the reduction of the principal amount of a debt secured by a lien on real property. *Id.* (citing and quoting *Barras*, 396 S.W.3d at 175–76; citing *In re Marriage of Donathan*, No. 10-16-00014-CV, 2017 WL 3298943, at *3 (Tex. App.—Waco Aug. 2, 2017, no pet.) (mem. op.)). Because Section 3.402(a)(3) lacks the measure that Section 3.402(d) uses, the measure that Section 3.402(d) uses should not apply when calculating a reimbursement under Section 3.402(a)(3). *See id.*

Because the trial court calculated the amount of the reimbursement based on the value of the California House instead of on the reduction in the balance of the debt, and because there is no evidence of the parties' having made improvements to the house, the calculation of the amount of the reimbursement is an abuse of discretion. *See Delancey*, 2011 WL 677401, at *10, 12 (abuse of discretion when trial court did not follow statutory formula for calculating claim). The evidence showed that Sarah and Dennis borrowed $400,000, secured by a mortgage, to buy the house. The court found that "[t]he outstanding debt on the residence is $200,000," and no one challenges that finding. Thus, the evidence supported a reimbursement of only $200,000 ($400,000 minus $200,000). *See* Tex. Fam. Code § 3.402(a)(3). We sustain Dennis's fourth issue.

## IV. Dennis did not conclusively prove his separate-property interest in $2,987.69 in a money-market account.

In his fifth issue, Dennis contends that the trial court improperly divested him of his separate-property interest in a money-market account. He argues that his evidence of the

18

balance of funds held in the account at the time of marriage plus the lack of any deposits into the account, aside from interest earned, or of any withdrawals from it conclusively proves his separate-property interest in an amount of funds in the account equal to the amount that it held at the time of marriage, with the remainder as community property.

His evidence on the issue was made up of his testimony, an exhibit that he prepared to summarize all the relevant activity in the account, and an exhibit of statements showing the monthly activity in the account from before the marriage through October 2019. The trial court, as noted above, found Dennis to be not credible about his separate-property claims, so we can give no weight to his testimony or to the summary exhibit that he alone prepared.

As for the exhibit of the statements of monthly activity, it shows the funds in the account as of the date of the marriage, includes some gaps over time, and lacks any data beyond October 2019. Sarah and Dennis were married on September 15, 2008. On that date, according to the exhibit of statements, Dennis held $2,987.69 in the account. The exhibit contains statements showing the monthly activity in the account from September 2008 through October 2019, except for missing statements corresponding with nine months within that period. Each such gap is never for longer than two consecutive months, and the statements on either side of each gap show the total amount of activity that took place during the gap. The highest amount of activity falling into any of the gaps is an increase of value of $2.79. In the nearly 11 years' worth of statements within the exhibit, the only activity in the account shown is interest earned. On the latest-in-time statement within the exhibit, the total amount of funds in the account is $3,380.47.

Because Dennis bore the burden of proof at trial to show his separate-property interest in $2,987.69 in this account, to reverse the trial court's ruling against him, we must hold that he presented conclusive evidence that $2,987.69 in the account was his separate

19

property. *Lecuona*, 2018 WL 2994587, at *2. "Evidence is conclusive only if reasonable people could not differ in their conclusions." *Id.* (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005)).

We hold that Dennis did not present conclusive evidence of his having $2,987.69 in separate-property funds in the account at the time of divorce. Decisions about division and valuation of property generally should be made effective as of the date of divorce. *See O'Carolan v. Hopper*, 414 S.W.3d 288, 311–12 (Tex. App.—Austin 2013, no pet.). There is a gap between the end of the statements' data, nothing beyond October 2019, and the date of divorce, March 3, 2020. Although the exhibit might constitute *some* evidence of the value of the separate property in the account as of the date of divorce, Dennis's burden here is much higher—*conclusive* evidence—because this is an issue on which he bore the burden of proof at trial but on which the trial court ruled against him with the appellate standard of review under the abuse-of-discretion standard. *See Lecuona*, 2018 WL 2994587, at *2. Reasonable minds could differ about whether the account retained any funds at all from November 2019 through March 3, 2020, especially given Dennis's testimony that his card-playing winnings were "very rocky" of late and that he needed to take loans from friends to pay his attorneys' fees. *See Goyal*, 2021 WL 2149628, at *16 ("[T]he party attempting to prove that property is separate must present evidence showing the account balance when the separate property is deposited, the amount and character of withdrawals and deposits, and whether the balance during marriage ever fell below the value of the separate-property interest."). We thus hold that the trial court did not err in applying its discretion

20

to the evidence before it by not confirming funds in this account as Dennis's separate property. *See id.* at *2. We overrule his fifth issue.[5]

**V.      The evidence supported awarding Dennis $20,000 in cash or chips in his possession.**

In his sixth issue, Dennis contends that no evidence supported the trial court's ruling that he currently had "$20,000 in cash or chips in his possession," which the court awarded him in the division of the community estate. He argues that the evidence on the topic amounted to no more than a mere scintilla about what amount in cash or chips he had.

During direct examination about Dennis's poker winnings, Sarah testified that Dennis regularly kept cash and chips in their house:

> Q. So around the house, you know, having a professional poker player, would you see chips around the house?
>
> A. Yes. In his nightstand and in his closet, he regularly had cash and chips.
>
> Q. Okay. About how much—how much on an average basis?
>
> A. It varied a lot, but 40 to 60,000 was kind of probably average.
>
> Q. Okay. And when you moved to Texas, did you know if he had any chips at that point in time?
>
> A. He definitely had some. I have no idea how much.
>
> Q. That was a regular thing that he would keep chips at the house?

---

[5] If Dennis also is challenging the factual sufficiency of the evidence supporting the court's ruling, we conclude that the trial court's ruling was not against the great weight and preponderance of the evidence. *See 12636 Rsch*, 2021 WL 417027, at *7 (citing *Fox v. O'Leary*, No. 03-11-00270-CV, 2012 WL 2979053, at *3 (Tex. App.—Austin July 10, 2012, pet. denied) (mem. op.)). To reiterate though, legal and factual sufficiency are not separate grounds of error under the standards applicable here. *See Goyal v. Hora*, No. 03-19-00868-CV, 2021 WL 2149628, at *2 (Tex. App.—Austin May 27, 2021, no pet.) (mem. op.). There was no evidence put forward by Sarah on this issue, so there is no evidence to weigh against Dennis's. Instead, his evidence simply fell short of proving conclusively what he sought to prove. *See City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005) (evidence is not conclusive simply because it is undisputed).

A.  Yes.

The trial court found Sarah to be a credible witness overall.

Dennis touched on the topic when he testified about why he thought he had about $100,000 in cash in his possession on the date of marriage, which was for playing cards:

> Yes.  So, as Ms. Eichhorn testified, I had a lot of cash around the house at various times.  It's nice to have cash so that you can always go to wherever the investment opportunity arises as quickly as possible, and then immediately invest the appropriate amount, and so, indeed, I did have a lot of cash around back at that time.  In addition, in the—I think in 2008 alone, prior to marriage, I had earned over a quarter million dollars investing, which is why, especially, at this time, there was a very large amount of cash in my possession.  It was probably a lot more than a hundred thousand dollars, in fact, but I am trying to sort of give the benefit of the doubt wherever I can, to say it was only a hundred thousand dollars.

The documentary evidence showed that Dennis would make chip withdrawals during the marriage from one of his casino accounts and keep the chips for some time.  For example, in December 2010, he withdrew $50,000 worth of chips without a follow-on deposit of chips until two weeks later.  There were similar chip withdrawals in February 2011—$60,000 worth—and May 2014—$60,000 worth again—without follow-on chip deposits until about two or three months later.  He testified elsewhere that his card-playing income has "been very up and down" and, specifically, "very rocky" during the last two years, with "some rocky stints in the middle," causing his total profit for "all of the marriage" to be "not very good."

Given the testimony and exhibits, reasonable minds could have reached the trial court's conclusion that Dennis currently had $20,000 in cash or chips in his possession.  *See Ganesan*, 96 S.W.3d at 353 ("The evidence supporting a finding amounts to more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case.").  The evidence supported finding that Dennis often had cash or chips in his possession valued at more

22

than five figures, that Sarah herself saw in his possession values of cash or chips of at least $40,000, that Dennis believed that he started the marriage with $100,000 in cash, and that his card-playing results had fluctuated over time with things growing more "rocky" recently. The trial court thus had sufficient information on which to exercise its discretion and did not err in applying its discretion, *see Goyal*, 2021 WL 2149628, at *2, when awarding Dennis the $20,000 in cash or chips in his possession when dividing the community estate. We overrule his sixth issue.

**VI.    Dennis did not conclusively prove a purported $27,500 debt that he incurred via loans from another person.**

In his seventh issue, Dennis contends that insufficient evidence supported the trial court's refusal to rule that he incurred $27,500 in debt by taking out two loans. In its findings and conclusions, the court said that the alleged debt had not been proven:

Husband's Personal Loans

Value: -$27,500

The Court finds that these alleged loans were [from] a friend of Respondent. The Court finds that in the exhibit that there were no payments required of this debt, no schedule of payment and no security against which the loans were taken. The Court finds that Dennis Eichhorn *did not prove that this debt was still due* or trace what happened to these funds or that these funds were used for proper community obligations. In addition, there was no evidence or insufficient evidence that this was a debt that was required to be paid back and what the terms of the debt [are]. Further there was no security to provide that these funds were required to be paid back by Respondent.

(Emphasis added.) Dennis argues that the evidence proved this $27,500 in debt.

But as with his fifth issue, Dennis must show that the evidence conclusively proved the $27,500 debt. *See Lecuona*, 2018 WL 2994587, at *2. The trial court admitted Dennis's exhibit of two promissory notes, dated, respectively, February 10, 2020, and February 28, 2020. But the exhibit itself does not conclusively prove that the debt still existed as of March 3, 2020—

23

the date as of which the trial court rendered divorce and valued and divided assets and liabilities. *See O'Carolan*, 414 S.W.3d at 311–12. Despite the exhibit's potential to be some evidence that $27,500 in debt existed as of March 3, 2020, it was not conclusive evidence because reasonable minds could differ about whether the debt had been repaid between the dates shown in the exhibit and March 3. We thus hold that the trial court did not err in its application of discretion to the evidence before it, *see Goyal*, 2021 WL 2149628, at *2, and overrule Dennis's seventh issue.[6]

## VII. Because of the two appellate issues that we have sustained, we remand for a new just-and-right division.

In his eighth issue, Dennis contends that errors in property characterization and valuation and in the reimbursement require a remand for a new just-and-right division of property. We have sustained his appellate issues about the confirmation of a separate-property interest in the Texas House and the reimbursement calculated based on the value of the California House. "If we find reversible error in any part of the trial court's property division that materially affects its just and right division of the community estate, we must remand for a new division of the entire community estate." *Delancey*, 2011 WL 677401, at *7 (citing *Jacobs v. Jacobs*, 687 S.W.2d 731, 732–33 (Tex. 1985)); *see* Tex. Fam. Code § 7.001 (trial court must divide community estate "in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage"). The abuse of discretion arising out of the Texas House leads to about $212,460 in value removed from the community estate. The evidence showed that the house was worth $300,000, and 70.88% of that amount is $212,460. Next regarding the California

---

[6] If Dennis is also challenging the factual sufficiency of the evidence, we again conclude that the trial court's ruling was not against the great weight and preponderance of the evidence. *See 12636 Rsch*, 2021 WL 417027, at *7 (citing *Fox*, 2012 WL 2979053, at *3). There was no evidence put forward by Sarah on this issue, so there is no evidence to weigh against Dennis's.

House, the abuse of discretion in calculating the reimbursement led to $164,800 more being awarded to the community estate than should have been ($364,800 minus $200,000). These matters substantially altered the size of the divisible community estate, so they materially affected the just-and-right division. *See Delancey*, 2011 WL 677401, at *10; *see also Reisler v. Reisler*, 439 S.W.3d 615, 624 (Tex. App.—Dallas 2014, no pet.) (remanding for new just-and-right division, instead of "simply modify[ing] the decree by striking the . . . account [in question] from the community property," because simply modifying the decree "would be to make a new division of the estate of the parties," which is within the trial court's discretion to do (citing *Jacobs*, 687 S.W.2d at 733)). We thus sustain Dennis's eighth issue to the extent it called for a remand for a new just-and-right division and remand to the trial court for a new such division.[7]

## VIII. The evidence was sufficient to support the awards of attorneys' fees and conditional appellate fees.

In his ninth issue, Dennis contends that the evidence was legally insufficient to support awarding Sarah any amount in attorneys' fees and any amount in conditional appellate fees. The trial court awarded Sarah $25,000 for the former and $70,000 for the latter added together for different levels of the appellate process.

---

[7] In his eighth issue, Dennis also challenges findings of fact 39 and 55, in which the trial court found specific facts and identified specific factors that supported its making a disproportionate division of the community estate, and conclusion of law 7, in which the trial court concluded that Sarah is entitled to a disproportionate division of the community estate. Dennis asserts that these findings of fact and this conclusion of law are not supported by the evidence. We disagree. Our holding does not rest on or affect the trial court's ability to award unequal shares in making its just-and-right division of the community estate. *See Murff v. Murff*, 615 S.W.2d 696, 698–99 (Tex. 1981). We remand so that the trial court can assess its just-and-right division of the community estate as that estate has been altered by this opinion.

## A.     Attorneys' fees

Dennis's challenge to the $25,000 award relies mainly on his view that Sarah's exhibit of attorney billing statements—her exhibit 38—was never admitted into evidence, thereby leaving her, he argues, with only her attorney's testimony on fees and expenses. The exhibit need have been admitted because "evidence that was not admitted into the record cannot inform an evidentiary-sufficiency analysis." *DeLeon v. Lacey*, No. 03-13-00292-CV, 2015 WL 4449436, at *4 (Tex. App.—Austin July 15, 2015, no pet.) (mem. op.).

Even when an exhibit has not been formally admitted into evidence, reviewing courts can treat the exhibit as having been "constructively admitted" in some cases. *See, e.g.*, *Texas Dep't of Pub. Safety v. Latimer*, 939 S.W.2d 240, 243 (Tex. App.—Austin 1997, no writ) (per curiam). Examples include when the exhibit is marked or offered, not objected to, and treated by the trial court and parties as admitted. *See Texas Health Enters., Inc. v. Texas Dep't of Hum. Servs.*, 949 S.W.2d 313, 314 (Tex. 1997) (per curiam) (citing collected cases with approval).

Sufficient circumstances exist in the record to treat Sarah's exhibit 38 as having been admitted. During the second day of trial, Sarah offered the exhibit, Dennis stated that there was no objection to it, but the trial court did not formally announce that the exhibit had been admitted. At the end of that day, the court told the parties that it would allow them to file evidence and arguments about attorneys' fees beyond that day. The next month, the court held a hearing on the topic of attorneys' fees, among other topics, and it reiterated what it had said at the end of the second day of trial. Only later during this hearing did the court announce the evidence closed.

During the hearing, Sarah's counsel twice referred to her exhibit 38. The first time, he mentioned the exhibit when the trial court asked him to begin "his attorney fees request." He said: "I was—we had introduced our attorneys' fees including summation exhibit at trial, so I'm

26

pulling up those documents. I—and as far as the attorneys' fees, I believe—and you already swore me in so I assume I'm still under oath and all that." The second time, he was testifying on cross-examination by Dennis's counsel and said that a purported payment of fees was not part of Sarah's exhibit for proving her fee request: "[I]f there is an additional attorneys' fees out there, they are not included in our exhibit, and so; therefore, we're not asking for those." Dennis's counsel did not object either time to Sarah's counsel's express reliance on the exhibit.

Under these circumstances, we treat Sarah's exhibit 38 as having been admitted into evidence even though the trial court never formally announced its admission.

We turn next to Dennis's challenge to the sufficiency of the evidence to support the $25,000 award. To secure an award of attorneys' fees and expenses, the party seeking the award must prove that the recovery is legally authorized and that the requested fees and expenses are reasonable and necessary for the legal representation so that the award will compensate the party generally for its losses resulting from the litigation process. *See Rohormoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 487–90 (Tex. 2019). Dennis does not contest that reasonable and necessary attorneys' fees and expenses are legally authorized here, under Family Code section 6.708(c).[8]

To prove a fee claim, a party "must put on evidence of reasonable hours worked multiplied by a reasonable hourly rate, yielding a base figure that can be adjusted by considerations not already accounted for in either the hours worked or the rate." *Id.* at 475. To do this, the party must "at a minimum" put on "evidence of (1) particular services performed, (2) who performed

---

[8] Even though the statute authorizes awards of "reasonable attorney's fees and expenses," the Supreme Court of Texas has instructed that the statutory term "reasonable" in fee-shifting statutes means "reasonable and necessary." *See Rohormoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 488–89 (Tex. 2019).

those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Id.* at 502. This yields the "lodestar" amount of the fee claim, which is presumptively a reasonable and necessary amount for fees. *Id.* at 496, 501–02. The amount can then be adjusted upward or downward by the trial court based on considerations that were not already baked into the lodestar calculation. *Id.* at 496, 501–02.

Sarah's counsel's testimony and her exhibit 38 were offered as proof of her attorneys'-fees claim. Her counsel testified about why he thought that the $27,555.00 in attorneys' fees that his firm had charged Sarah were reasonable and necessary:

> I'm a licensed attorney in the State of Texas. I am board certified. I was board certified in 2—or I'm sorry 2001. I've been recertified every five years since that point in time.
>
> I am familiar with—I charge $450 an hour. I am familiar with the expenses or cases of this difficulty, the legal fees that are incurred regarding that. I have prepared— I would offer Petitioner's Exhibit No. 38, which is the redacted statements that set out the attorneys' fees and there's also summation.
>
> So far, as far as attorney's fees, Ms. Eichhorn has incurred [$]27,555 with me, about [$]1,369.75 with regards to expenses. . . .
>
> . . . .
>
> . . . [I]t's all set out in what I would argue is reasonable and necessary, or I testify to reasonable and necessary.

Sarah's exhibit 38 includes her counsel's firm's billing statements, which show discrete services performed by her counsel or by another timekeeper at his firm, called "JT." The testimony did not address JT or why that person's hourly rate is reasonable. *See id.* at 502 (evidence of fee claim must "at a minimum" include "evidence of . . . (2) who performed those services . . . [and] (5) the reasonable hourly rate for each person performing such services"). But even removing fees

28

attributable to JT from the fee claim, Sarah still offered evidence of $27,180.00 in attorneys' fees charged by her counsel's firm for her counsel's work. His testimony and the exhibit together referred to the tasks that he performed and the time it took him to perform them as reasonable and necessary, and the exhibit shows generally what the tasks were and when he performed them. Counsel's testimony and the exhibit together set forth sufficient evidence for a lodestar claim of $27,180.00 in attorneys' fees, which was thus a presumptively reasonable amount of fees for the trial court to award. *See id.* at 496, 501–02. Because the trial court awarded $25,000 based on the evidence, the award was within the trial court's discretion to make. We overrule this part of Dennis's ninth issue. On remand for the just-and-right division, the trial court could entertain requests from either party to make an award of fees from out of the division or could entertain motions to reconsider the fee award that we have now reviewed.

### B. *Conditional appellate fees*

In the rest of his ninth issue, Dennis contends that the evidence was insufficient to support awarding Sarah conditional appellate fees in these amounts: $35,000 for Dennis's unsuccessful appeal to the court of appeals, $5,000 if Dennis's request for an oral argument in the court of appeals is granted, $10,000 for Dennis's petitioning for review in the Supreme Court of Texas if that appeal is ultimately unsuccessful, $15,000 if the Supreme Court requests merits briefing but the appeal is ultimately unsuccessful, and $5,000 if the Supreme Court grants oral argument but the appeal is ultimately unsuccessful.

Because of the nature of conditional appellate fees—they have not yet been incurred when they must be requested—proving a claim for them differs from proving a claim for trial fees. *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 355 (Tex. 2020). Still, to prove

29

the claim, a party must offer expert testimony "about the services it reasonably believes will be necessary to defend the appeal and a reasonable hourly rate for those services." *Id.*

Sarah's counsel, on top of testifying about his hourly rate, testified about the conditional appellate fees:

> [W]e have requested attorneys' fees should there be . . . filing of notice of appeal, and all the way through appeal of the Supreme Court.
>
> . . . .
>
> If there is a notice of appeal to the Third Court of Appeals, a $35,000. Oral arguments, an additional $5,000. Petition to be reviewed to the Supreme Court [$]10,000 and briefing at the Supreme Court another $15,000. Oral argument to the Supreme Court another [$]5,000, and it's all set out in what I would argue is reasonable and necessary, or I testify to reasonable and necessary.

Counsel referred to a part of Sarah's exhibit 38 that he prepared to go with this testimony. In that part of the exhibit, he wrote:

> Requested Fees For . . . Appeal
>
> . . . .
>
> | | |
> |---|---|
> | Filing of Notice of Appeal/Briefing in the Court of [A]ppeals . . . | $35,000.00 |
> | Representation For Oral Argument In the Court of Appeals | $ 5,000.00 |
> | Petition for Review Stage in the Supreme Court of Texas | $10,000.00 |
> | Merits Briefing Stage in the Supreme Court of Texas | $15,000.00 |
> | Oral Argument and the Completion of Proceedings in the Supreme Court of Texas | $ 5,000.00 |

(Bolding removed and formatting altered.)

The combination of counsel's testimony and this part of the exhibit thus addressed the reasonable hourly rate he would charge for the appellate services listed, and the trial court

could reasonably infer from the evidence what appellate services would reasonably be necessary—what happens in the event of Dennis's notice of appeal, what happens if there is a petition for review, and so on. The evidence thus was sufficient to support the award of conditional appellate fees, and we overrule the rest of Dennis's ninth issue.

## CONCLUSION

We affirm in part and reverse and remand in part the trial court's decree. We affirm the decree's rendition of divorce but reverse the parts of the decree that confirmed in Sarah's favor a separate-property interest in the Texas House and the parts that calculated the reimbursement based on the value of the California House. We remand for a new just-and-right division and for further proceedings consistent with this opinion.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed in Part; Reversed and Remanded in Part
    Concurring and Dissenting Opinion by Justice Triana

Filed: May 20, 2022